## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOAN HAWK,<br><br>            Plaintiff,<br><br>        v.<br><br>CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY,<br><br>            Defendant. | CASE NO. 1:14-cv-00337-CCC-GBC<br><br>(CHIEF JUDGE CONNER)<br><br>(MAGISTRATE JUDGE COHN)<br><br>REPORT AND RECOMMENDATION<br>TO VACATE THE DECISION OF<br>THE COMMISSIONER AND<br>REMAND FOR FURTHER<br>PROCEEDINGS<br><br>Docs. 1, 11, 12, 15, 16, 19 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Joan Hawk for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff asserts disability as a result of, *inter alia*, back, knee, and ankle pain. Plaintiff had spine surgery in 2001 and ankle surgery in 2009, but she was able to return to work until approximately October of 2010. However, by June of 2010, she had diffuse swelling in her knee, was walking with a cane, and imaging studies showed moderate degenerative changes, joint space narrowing, meniscal tears, and a

complete ACL tear. By July of 2010, she had significant swelling and increased pain in her ankle. Injections in her ankles initially provided relief, but by May of 2011, her doctors determined that a screw from her former surgery was protruding and causing her pain. She had a second ankle surgery in June of 2011. She continued to experience pain in her knee, and by July of 2011, imaging indicated that her medial joint had been obliterated and she was diagnosed with advanced osteoarthritis of the knee. As a result, she had a total knee replacement surgery in September of 2011. At the same time, an EMG indicated radiculopathy in her spine and sensory neuropathy. Plaintiff continued treating with her neurologist, Dr. Fuhai Li, and reported back, ankle, knee, and hip pain. Dr. Li treated her with a combination of injections, Oxycodone, and Fentanyl. Dr. Li submitted an opinion that, due to Plaintiff's back, knee, and ankle pain, she could only stand or walk for two hours out of an eight-hour work day.

However, the administrative law judge ("ALJ") concluded that the medical records lacked objective evidence, and found that Plaintiff could stand or walk for six hours out of an eight-hour workday. The ALJ did not rely on any medical opinion to support this conclusion; the only medical opinion in the file was from Dr. Li. Plaintiff asserts that the ALJ erred in rejecting her credibility regarding her limitation in standing and walking for prolonged periods. The Court finds that the ALJ erred in rejecting Dr. Li's opinion based on an independent review of the

medical records. As a result, the credibility assessment is flawed, because Dr. Li's opinion supported Plaintiff's claims. The ALJ substituted her expertise for that of a competent physician in finding that Plaintiff could stand or walk for six hours out of an eight-hour workday without obtaining a medical opinion to support this conclusion. The Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings.

## II.    Procedural Background

On July 29, 2011, Plaintiff filed an application for DIB under Title II of the Act. (Tr. 109-110). On October 31, 2011, the Bureau of Disability Determination denied this application (Tr. 76-88), and Plaintiff filed a request for a hearing on December 29, 2011.  (Tr. 89-90). On October 18, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 25-75).  On January 14, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 8-24). On February 9, 2013 Plaintiff filed a request for review with the Appeals Council (Tr. 7), which the Appeals Council denied on November 22, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On February 24, 2012, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On April

30, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 11, 12). On July 22, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 15). On August 22, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 16). On November 5, 2014, the Court referred this case to the undersigned Magistrate Judge. On November 22, 2014, Plaintiff filed a brief in reply. (Doc. 19). The matter is now ripe for adjudication.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the

claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on September 8, 1956, and was classified by the regulations as a person closely approaching advanced age through the date of the ALJ decision. 20 C.F.R. § 404.1563.  (R. 109). She has a high school education and past relevant work as a microbiology technologist. (Tr. 20, 31).

Plaintiff began complaining of knee, ankle and back pain as early as 2001. (Tr. 471, 563). In 2001, she had a spinal fusion, bone graft, and laminectomy on her spine. (Tr. 460-64). She returned to work on September 24, 2001. (Tr. 450). In

2006, she was treated with injections. (Tr. 561). An EMG from 2006 indicated "right ulnar motor and sensory peripheral neuropathy primarily demyelinating in nature across the wrist, consistent with right Gayon's tunnel syndrome" and "bilateral median motor and sensory neuropathy primarily demyelinating in nature across both wrists, consistent with bilateral carpal tunnel syndrome, moderate to severe in degree." (Tr. 258). In 2007, an MRI of her ankle indicated "significant marrow edema" with "irregular cyst formation and articular cartilage loss." (Tr. 430). Her "articular surfaces" were "irregular with developing marginal osteophytes." (Tr. 430). She also had "diffuse sprain and mild partial-thickness tearing," her "peroneus brevis appear[ed] partially split," and she had "diffuse tendinopathy." (Tr. 430). On February 4, 2008, an X-ray "show[ed] moderately advanced degenerative arthrosis of her ankle." (Tr. 420). She also had "very limited motion of her ankle" and walked with "an external rotation gait." (Tr. 419). In July of 2009, she had a surgical fusion in her ankle. (Tr. 285-86, 310). However, she was able to return to work until about October 1, 2010. (Tr. 133).

On June 23, 2010, Plaintiff followed-up at her primary care physician's office with Russell Horn, PA-C. (Tr. 333). She was reporting a very swollen and painful knee and her "chronic back condition [was] flaring up." (Tr. 333). She needed a "cane to help her ambulate." (Tr. 333). On exam, she had "diffuse swelling of [right] knee from distal thigh to ankle" and "several para lumbar

muscle spasm areas that are painful." (Tr. 333). Skelaxin was added to her medication regimen and she was scheduled for diagnostic imaging. (Tr. 334).

On July 8, 2010, Plaintiff was evaluated at Mountain Valley Orthopedics for right knee pain. (Tr. 559). X-rays indicated "moderate tricompartmental degenerative changes with medial joint space narrowing." (Tr. 560, 383). An MRI of the right knee demonstrated "tricompartmental chondromalacia, medial lateral meniscal tears, complete ACL tear" and "moderate knee effusion." (Tr. 560).

On July 12, 2010, Plaintiff saw Dr. Steven Raikin, M.D., the orthopedist who had performed her ankle fusion.  (Tr. 303-04). Plaintiff reported that she had done well after her surgery until one month earlier, when she began experiencing pain that was worse with ambulation and activity. (Tr. 303). She had to start using a cane. (Tr. 303). On exam, she had a "significant amount of swelling about the lateral aspect of her right ankle with significant tenderness to palpation." (Tr. 303). One of her screws from the ankle fusion was "slightly protruding." (Tr. 303).

On September 8, 2010, Plaintiff presented to Dr. Jonathan Goldner, D.O., her primary care physician. (Tr. 330). Plaintiff's medications included lisinopril, EpiPen, simvestatin, skelaxin, aspirin, Fluticasone propionate, and paroxetine. (Tr. 330). She was complaining of neck pain, sinus congestion, fatigue, right knee pain, and stress. (Tr. 330). There was "[n]o increase in pain with movement" and Plaintiff described her pain as a "tightness." (Tr. 330). On exam she had full range

of motion, although she felt tightness with "extremes of lateral rotation." (Tr. 331). She had "[s]ome increased bilateral muscle tension bilaterally posterior. (Tr. 331). Plaintiff's depression medication was increased and Dr. Goldner ordered laboratory studies to evaluate her fatigue. (Tr. 331).

On November 22, 2010, Plaintiff followed-up with Jeffrey S. Pallas, PA-C, at Dr. Goldner's office. (Tr. 328). Plaintiff was complaining of long standing neck pain and requested documentation for a breast reduction. (Tr. 328). On exam, she had full range of motion with tightness. (Tr. 328). Mr. Pallas discussed the breast reduction with Dr. Goldner, who wrote a request for breast reduction surgery. (Tr. 328). Plaintiff's medications remained the same. (Tr. 328).

On February 7, 2011, Plaintiff followed-up at the Rothman Institute with Dr. Raikin. (Tr. 302). He noted that Plaintiff had a right ankle fusion on July 23, 2009. (Tr. 301). They had last seen her on July 12, 2010, when she was complaining of increased lateral ankle pain. (Tr. 301). She had an injection at that time, "which gave her relief until this past month." (Tr. 301). Plaintiff reported "her pain is episodic" and "usually alleviated with about 24 hours of rest." (Tr. 301). On exam, she had tenderness to palpation in her ankle. (Tr. 301). Imaging studies that day indicated "some arthritis" in her ankle joints. (Tr. 301). Plaintiff received another injection and was "recommended to wear her rockerbottom shoes to alleviate the pain in the anterior aspect of the ankle." (Tr. 302).

On May 2, 2011, Plaintiff followed-up with Dr. Raikin at the Rothman Institute. (Tr. 297). Plaintiff reported that her February, 2011 injection "helped initially but now she has had increasing pain in the subtalar region" and her "daughter states that the pain is so great that it brings her to her knees." (Tr. 297). Plaintiff had "positive tenderness…with attempted motion." (Tr. 297). Dr. Raikin recommended a CT scan, prescribed Celebrex to "help aid with the pain," and opined that she "would benefit from a subtalar fusion." (Tr. 297).

On May 12, 2011, a CT scan of Plaintiff's ankle indicated that a "cannulated screw…projects into the sinus tarsi," "arthritic changes in tibiofibular syndesmosis," and "mild to moderate degenerative changes" with a "trabeculated lesion." (Tr. 313).

On May 16, 2011, Plaintiff followed-up with Russell Horn, PA-C, at Dr. Goldner's office. (Tr. 325). Plaintiff was complaining of pain in her lower back, right knee, and right ankle. (Tr. 325). Notes indicate she "has MRI showing internal derangement of [right] knee." (Tr. 325). Plaintiff reported that her knee was "very painful as is the back and ankle on all activities." (Tr. 325). She was "[h]aving difficulty [with activities of daily living], walking, standing because of the pain." (Tr. 325). Plaintiff reported that over-the-counter medications were not working and Tramadol was not helping. (Tr. 325). She reported that she went to the emergency room several weeks earlier and was given Dilaudid "which did not

help but Toradol did." (Tr. 325). Plaintiff was prescribed Vicodin for her pain. (Tr. 325).

On May 25, 2011, Plaintiff was evaluated by Dr. Fuhai Li, M.D., at the Neurology and Pain Management Center. (Tr. 368, 597). Plaintiff reported aching, constant back pain that was a seven on a ten point scale. (Tr. 366). She reported that her "pain [was] exacerbated by standing or sitting for prolonged period of time." (Tr. 366). Plaintiff reported her pain was relieved by "medication and massage." (Tr. 366). Plaintiff reported that Percocet "helped," and that she had also been prescribed Opana, but it was too expensive for her to continue. (Tr. 366). Plaintiff reported that she had tried physical therapy, but it "did not help much." (Tr. 366). Plaintiff reported no associated numbness, tingling, or weakness. (Tr. 266). Plaintiff also complained of knee pain and described her pain as aching, a six on a ten point scale. (Tr. 366). On exam, she had normal range of motion in her neck. (Tr. 367). She had an antalgic gait, but her neurologic exam was otherwise normal. (Tr. 367). She had "focal tenderness in the paraspinal area of lower lumbar spine on the right side." (Tr. 367). She was assessed to have "lumbosacral root lesions, not elsewhere classified," "chronic pain syndrome," and "unspecified internal derangement of knee." (Tr. 367). She was prescribed Fentanyl patches and Oxycodone. (Tr. 367).

On June 1, 2011, Plaintiff followed-up with Dr. Raikin at the Rothman Institute. (Tr. 295). Dr. Raikin reviewed the CT scan and observed that the screw "does appear to be penetrating through into the sinus tarsi area causing potential irritation in this zone" and "mild arthritic changes." (Tr. 295). Dr. Raikin recommended surgery to remove the screw. (Tr. 296).

On June 6, 2011, Plaintiff followed-up with Dr. Goldner for a pre-operative clearance. (Tr. 322). Plaintiff reported that she felt "well other than pain in her right ankle" and that she was taking Percocet for the pain. (Tr. 322). Plaintiff's examination was normal, and she was cleared for surgery. (Tr. 322-23).

On June 7, 2011, Plaintiff had surgery to remove the painful screw. (Tr. 289). She had "failed to respond to nonoperative treatment." (Tr. 289).

On June 17, 2011, Plaintiff followed-up with Mr. Horn at Dr. Goldner's office to have staples removed from her Achilles area. (Tr. 320). She reported the area was "feeling well [without] drainage or pain." (Tr. 320). Plaintiff's staples were removed without difficulty. (Tr. 320).

On June 23, 2011, Plaintiff followed-up with Dr. Li. (Tr. 364, 595). Plaintiff reported that her back pain had been stable since her last visit, she had not tried physical therapy, and her medications helped her pain. (Tr. 364). Plaintiff continued to report that she had knee pain, and that Oxycodone was only helping her pain "slightly." (Tr. 364). On exam she had an antalgic gait, but her neurology

exam was otherwise normal. (Tr. 364). She had "focal tenderness in the paraspinal area of the lumbar spine." (Tr. 365). Dr. Li gave Plaintiff an injection in her knee. (Tr. 365). Dr. Li also increased Plaintiff's Oxycodone and continued her Fentanyl patches. (Tr. 365).

On July 1, 2011, Plaintiff followed-up with Dr. Raikin at the Rothman Institute. (Tr. 293). Plaintiff reported that "the lateral ankle pain is much better but she now has anterior ankle pain" and "feels like she is walking on a broken ankle." (Tr. 293). Plaintiff "also [had] the perception that her leg [was] significantly more swollen all the way up to her knee than the contralateral left side that has not had surgery." (Tr. 293). Plaintiff was wearing a boot "when she has longer distances to traverse." (Tr. 293). Notes indicate that:

> Dr. Raikin objectively measured both of the legs today for her. These do not show any difference in size and no objective quantification of swelling in the limb. There is no clinical reason for the discomfort that the patient is currently experiencing. The patient was previously on chronic narcotics preoperatively. She also has a known arthritis in her knee. Dr. Raikin states this may be heightened pain response due to chronic narcotics as well as more stress going across the ankle area related to the knee. Dr. Raikin could not give the patient clear and definitive answers to why she is experiencing the discomfort that she is as he cannot find an objective medical finding to support it. Dr. Raikin spent a profound time with the patient. The patient was very tearful. His recommendations at this time were to begin weaning herself in her boot and increase her activities as she was comfortable tolerating possibly getting the knee evaluated.

(Tr. 294).

On July 8, 2011, Plaintiff had an evaluation with Dr. Kenneth Brislin, M.D. at OAA Orthopaedic Specialists for right knee pain. (Tr. 399). On exam, she had a "limp and antalgic gait." (Tr. 401). She had swelling in her right knee. (Tr. 401). She also had tenderness, crepitus, decreased range of motion, and pain elicited by motion. (Tr. 401). An X-ray showed "evidence of osteoarticular abnormality," specifically "obliteration of the medial joint space on the right side with osteophytes formation noted." (Tr. 395).  Dr. Brislin summarized his findings:

> [Plaintiff] presents today for evaluation of her right knee. She has had extensive treatment for this right knee. Based on her current complaints, based on her new X-rays, and based on her exam, I feel that she has advanced osteoarthritis of the knee. I explained to her today, that any nonoperative treatment will only provide temporary relief from the symptoms of arthritis. It will not prevent the arthritis [from] getting worse. I also discussed surgical interventions. There is no role for arthroscopy in the treatment of her knees. I would recommend she be evaluated for total knee arthoplasty of the right and possibly the left knee. I will recommend an evaluation by Dr. Kevin Anbari.

(Tr. 401).

On July 21, 2011, Plaintiff followed-up with Dr. Li. (Tr. 362, 593). Plaintiff reported that her back pain had been worse since the last visit, indicated that she still had knee pain, and complained of right hip pain. (Tr. 593). On exam, Plaintiff had full range of motion in her neck. (Tr. 593). Plaintiff had an antalgic gait and "focal tenderness in the paraspinal area of the lower lumbar spine." (Tr. 594). Plaintiff's Fentanyl was increased, her Oxycodone was continued, and Dr. Li gave her a "right hip bursitis injection." (Tr. 594).

On July 25, 2011, Plaintiff had an evaluation with Dr. Kevin Anbari, M.D., at OAA Orthopaedic Specialists for her knee pain. (Tr. 397). Her medications included Moviprep, Fentanyl, Oxycodone, Meloxicam, Epipen, Simvastatin, Paroxetine, and Fluticasone. (Tr. 397). Plaintiff reported that her knee pain was associated with stiffness and was "worse with prolonged sitting and standing," along with stairs. (Tr. 398). Plaintiff reported that over-the-counter medications and injections had not provided her with relief. (Tr. 398). On exam, her gait was "guarded." (Tr. 398). Plaintiff had "moderate tenderness" in her knee. (Tr. 398). Dr. Anbari reviewed X-rays of her knee that "reveal[ed] severe joint narrowing in the medial and patellofemoral compartments" and "moderate osteophytes formation in the knee." (Tr. 398). Plaintiff had tried medications, injections, activity modification, and physical therapy "without success," and "[b]ased on the severity and duration of symptoms and the physical exam and radiographic findings," Dr. Anbari recommended a knee replacement surgery. (Tr. 398).

On August 4, 2011, Plaintiff had a face-to-face interview with the state agency. (Tr. 129). Her interviewer observed that Plaintiff had "difficulty" with "walking," explaining that she "walked with a slight limp." (Tr. 128).

On August 10, 2011, Plaintiff presented to Dr. Goldner for a pre-operative clearance for her total knee replacement. (Tr. 317). Plaintiff's exam was normal and she was cleared for surgery. (Tr. 318).

On August 18, 2011, Plaintiff followed-up with Dr. Li. (Tr. 359, 591). Plaintiff reported that her back pain had been worse since her last visit and that she occasionally needed to take an extra Oxycodone. (Tr. 359). She reported that she still had knee pain and also complained of hip pain. (Tr. 359). Dr. Li noted that there had been no lumbar imaging study since her last visit.[1] (Tr. 359). On exam, she had full range of motion in her neck. (Tr. 359). She had an antalgic gait and "focal tenderness in the paraspinal area of the lower lumbar spine." (Tr. 360). Dr. Li gave Plaintiff an injection in her hip and scheduled her for an EMG that day. (Tr. 360). The EMG indicated "electrophysiological evidence of radiculopathy at the level of right lower lumbar spine and bilateral tibial motor and right…sensory neuropathy." (Tr. 599).

The same day, Plaintiff submitted a Function Report. (Tr. 150). She indicated that she had no problem with personal care except for putting her shoes off and on. (Tr. 144). She indicated that she has problems with sleep, and never sleeps the whole night due to pain. (Tr. 144). She indicated that she cared for her three-year old grandson occasionally, but that it was "limited." (Tr. 144). She reported that she fed her animals, but was no longer able to walk or play with them. (Tr. 144). She reported that her daughter and grandson had moved into her

---

[1] The ALJ and the Commissioner interpret Dr. Li's notation that there had been no lumbar imaging study "since the last visit" to mean that there were no "current" imaging studies. (Def. Brief at 11). However, Dr. Li simply noted at each monthly visit that there had been no study since the last visit; Dr. Li never indicated that imaging studies were not "current." (Tr. 585, 587, 589).

house to help her. (Tr. 144). She indicated that she was no longer able to make meals, and that her daughter did the cooking because she was in too much pain to stand that long. (Tr. 146). She indicated that she does laundry and cleaning, but needs help to do them. (Tr. 145). She reported that she leaves her house daily and goes shopping, but her daughter or sister have to take her. (Tr. 146). She indicated that she used to enjoy gardening and reading, but was no longer able to garden and had lost interest in gardening. (Tr. 147). She indicated that she goes to church and the store on a regular basis. (Tr. 147). She generally indicated problems with lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, completing tasks, concentration, and using her hands. (Tr. 148). She indicated that she does not handle stress well and uses a cane, crutches, and a brace or splint. (Tr. 149). She indicated that her medications make her tired. (Tr. 150).

On September 7, 2011, Plaintiff had a total right knee replacement. (Tr. 481, 534-35). She was discharged from the hospital on September 10, 2011. (Tr. 525).

On September 16, 2011, Plaintiff followed-up with Dr. Li. (Tr. 589). Plaintiff reported that her back pain had gotten worse. (Tr. 589). Plaintiff continued to complain of right hip pain. (Tr. 589). Plaintiff continued to have full range of motion in her neck, antalgic gait, and focal tenderness in the paraspinal area of lower lumbar spine on the right side. (Tr. 589). Her medications were continued. (Tr. 590).

On September 20, 2011, Plaintiff presented to the emergency room at Pocono Medical Center complaining of pain in her right knee and down her leg. (Tr. 547). She had redness and swelling to her lower leg. (Tr. 547). She had edema in her right leg. (Tr. 548). She was given intravenous morphine and other medications. (Tr. 545). She was discharged home and was ambulating with a cane. (Tr. 548).

On October 6, 2011, Plaintiff followed-up with Dr. Anbari. (Tr. 501, 521). Plaintiff reported that she was "doing well," her cane had been "left in the car, and she finds she does not need it much of the time." (Tr. 501). She was taking a "rare Percocet, and requests more." (Tr. 501). Plaintiff's physical exam and imaging were normal. (Tr. 501). Plaintiff was released to weight bearing as tolerated ("WBAT") and instructed to "practice driving in a parking lot to start and return to driving if she feels comfortable." (Tr. 502).

On November 15, 2011, January 13, 2012, and March 13, 2012, Plaintiff followed-up with Dr. Li. (Tr. 581, 585, 587). At each visit, Plaintiff reported that her back pain had gotten worse. *Id.* Plaintiff continued to complain of right knee and right hip pain. *Id.* Plaintiff continued to have full range of motion in her neck, antalgic gait, and focal tenderness in the paraspinal area of lower lumbar spine on the right side. *Id.* Her medications were continued. *Id.* On March 12, 2012, Dr. Li also gave Plaintiff a lumbar paraspinal trigger point injection. (Tr. 582).

On May 10, 2012, Plaintiff followed-up with Dr. Li. (Tr. 579). Plaintiff reported that her back pain had been stable since her last visit. (Tr. 579). Plaintiff continued to complain of right knee and right hip pain. (Tr. 579). Plaintiff continued to have full range of motion in her neck, antalgic gait, and focal tenderness in the paraspinal area of lower lumbar spine on the right side. (Tr. 580). Her medications were continued. (Tr. 580).

The same day, Dr. Li completed a medical source opinion. (Tr. 570). She noted that Plaintiff's diagnoses included chronic back pain, lumbar radicular pain, bilateral knee pain, and a right ankle revision. (Tr. 565). She opined that Plaintiff's prognosis was "guarded." (Tr. 565). She indicated that Plaintiff had pain in her lower back, both knees, and right ankle; she suffers from a lack of sleep, and uses a cane. (Tr. 565). She indicated that Plaintiff had focal tenderness in the lumbar paraspinal area and she was treated with Oxycodone and Fentanyl. (Tr. 565). She opined that Plaintiff's pain would "frequently" interfere with her concentration. (Tr. 566). She indicated that Plaintiff could "at times" walk less than a block, and at others "a block or more." (Tr. 567). She opined that Plaintiff could sit for fifteen minutes at a time and could sit for less than two hours total out of an eight-hour workday. (Tr. 567). She opined that Plaintiff could stand for thirty minutes at a time and could stand for less than two hours total out of an eight-hour workday. (Tr. 567). She opined that Plaintiff would need a job that permits shifting positions

at will and would need to take unscheduled breaks during an eight-hour workday. (Tr. 568). She opined that Plaintiff could rarely lift less than ten pounds and could never lift ten pounds or more. (Tr. 568). She opined that Plaintiff would be absent more than four days per month. (Tr. 569). She indicated that Plaintiff was not capable of working a full-time work schedule. (Tr. 570).

On May 30, 2012 and July 20, 2012, Plaintiff followed-up with Dr. Li. (Tr. 575, 577). At each visit, Plaintiff reported that her back pain had been stable. *Id*. Plaintiff continued to complain of right knee and right hip pain. *Id*. Plaintiff continued to have full range of motion in her neck, antalgic gait, and focal tenderness in the paraspinal area of lower lumbar spine on the right side. *Id*. On May 30, 212, Plaintiff reported that she could no longer take Fentanyl because she could not afford it without insurance, and Dr. Li increased her Oxycodone. (Tr. 577-78). On July 20, 2012, her medications were continued. (Tr. 576).

On September 18, 2012 Plaintiff followed-up with Dr. Li. (Tr. 573). Plaintiff reported that her back pain had been stable. (Tr. 573). Plaintiff continued to complain of right hip pain, but indicated that her right knee pain was better. (Tr. 573). She also complained of right ankle pain. (Tr. 573). Plaintiff continued to have full range of motion in her neck, antalgic gait, and focal tenderness in the paraspinal area of lower lumbar spine on the right side. (Tr. 573-74). Her medications were continued. (Tr. 574).

On October 18, 2012, Plaintiff appeared and testified at a hearing before an ALJ. (Tr. 25). Plaintiff testified that she received unemployment for a year and a half. (Tr. 33). She testified that she had "just started" the "time period when [she] had to certify" that she was able and available to work. (Tr. 34). She testified that she was looking for work in her field, sent our resumes, and went on interviews. (Tr. 34-35). However, she testified that she did not think she was capable of actually doing the full-time work. (Tr. 47). She testified that she began using a cane three years earlier, but was afraid to bring it to work because she thought she would get fired. (Tr. 49). She testified that she could not work do to pain in her back and ankle and "flare-ups" in her knees. (Tr. 35). She testified that she "can hardly drive" and that she has to be able to lay down and recline. (Tr. 35). She testified that she cannot perform the lifting requirements of work and does not "even lift [her] grandson." (Tr. 36). She testified that she did not have physical therapy for her ankle because her doctors did not "want to have [it] manipulated." (Tr. 38). She testified that she had injections since her surgery. (Tr. 39). She testified that she had tried physical therapy, home stretching, a "manipulation" under anesthesia, and "many injections" over the years. (Tr. 42). She also testified that she could not afford some of her medications. (Tr. 44). She testified that her medication makes her fall asleep in the morning. (Tr. 44).

Plaintiff testified that she could do laundry "in stages," but cannot "run a vacuum" and was "fairly limited" in her ability to garden. (Tr. 44). She was able to dust. (Tr. 44). She testified that she flew to Ireland, which was "huge mistake" because she was "up and down a lot." (Tr. 45). She testified that she could only walk for ten or fifteen minutes at a time. (Tr. 51). She testified that her daughter had moved in with her and did the majority of the cooking and the chores. (Tr. 52). She testified that her sister or daughter generally needed to shop with her or for her. (Tr. 53). She testified that she could sit for fifteen to thirty minutes at a time. (Tr. 53). She testified that walking on uneven surfaces and inclines was "very difficult." (Tr. 54). She testified that she had problems with bending and with concentrating due to her pain. (Tr. 57-59). She explained that her flare-ups can last for two weeks to a month. (Tr. 59).

A vocational expert also appeared and testified. (Tr. 61). The VE testified that, given the RFC assessed by the ALJ described below, Plaintiff could perform her past relevant work as a microbiology technologist. (Tr. 72). The VE also testified that if Plaintiff would be off task ten percent of the time or absent two or more days per month, she would be unable to perform any work. (Tr. 74).

On January 14, 2013, the ALJ issued the decision. (Tr. 20). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 1, 2010. (Tr. 13). At step two, the ALJ found that Plaintiff's osteoarthritis

of the right knee status post total knee replacement, degenerative disc disease of the lumbar spine status post discectomy and hemilaminectomy, and arthritis of the right ankle with soft tissue impingement in the sinus tarsi of the right ankle status post hardware removal were medically determinable and severe. (Tr. 14). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 15-16). The ALJ found that Plaintiff had the RFC to perform light work limited to occasional balancing, stopping, crouching, and climbing and never climbing ladders, ropes, or scaffolds, crawling, kneeling, or working around concentrated exposure to vibrations and hazards. (Tr. 16-19). At step four, the ALJ found that Plaintiff could perform her past relevant work as a microbiology technologist. (Tr. 20). Consequently, the ALJ found that Plaintiff was not disabled within the meaning of the Act and not entitled to benefits. (Tr. 20).

## VI.    Plaintiff Allegations of Error

### A.    The ALJ's credibility and RFC assessment

Plaintiff asserts that the ALJ erred in failing to include limitations for prolonged sitting and standing in the RFC assessment. (Pl. Brief at 7-12). Plaintiff asserts that she reported limitations in prolonged sitting and standing, and that these reports were credible because they were corroborated by medical evidence. (Pl. Brief at 12-18). Defendant responds that Plaintiff has not alleged any additional specific limitations. (Def. Brief at 16). Plaintiff replies that "a mere

reference to a Medical Source Statement from Ms. Hawk's treating neurologist [Dr. Li] shows significant functional limitations not accounted for in the RFC assessment." (Pl. Reply at 4).

Plaintiff's appeal brief asserted specific limitations in prolonged sitting and standing that were not assessed by the ALJ. (Pl. Brief at 7-12). These limitations were supported by Dr. Li's medical source statement. (Tr. 565-70). The ALJ did not rely on any medical opinion that supported her conclusion that Plaintiff could engage in prolonged sitting and standing. The initial disability denial came from a "single decision-maker ("SDM")" who "is a non-examining, nonmedical employee at the state agency level." *Chandler v. Colvin*, 3:14-CV-867, 2014 WL 4793963, at *13 (M.D. Pa. Sept. 23, 2014) (Conaboy, J.) (citing *Yorkus v. Astrue*, CIV.A. 10-2197, 2011 WL 7400189, at *4 (E.D. Pa. Feb. 28, 2011) ("There is significant case law supporting the plaintiff's position that the RFC assessment of the SDM is entitled to no evidentiary weight. Additionally, the Agency's own policy prohibits the ALJ from relying on the RFC assessments of an SDM.") (internal citations omitted)); (Tr. 76-82). As Courts in this District have repeatedly emphasized:

> The Court recognizes that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. *See Burnett v. Commissioner of Social Sec. Admin.,* 220 F.3d 112, 121–122 (3d Cir.2000). However, rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. *See Doak*

> *v. Heckler,* 790 F.2d 26, 29 (3d Cir.1986) ("No physician suggested
> that the activity Doak could perform was consistent with the definition
> of light work set forth in the regulations, and therefore the ALJ's
> conclusion that he could is not supported by substantial evidence.");
> 20 C.F.R. § 404.1545(a).

*Gormont v. Astrue*, 3:11-CV-02145, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4,

2013) (Nealon, J.); *see also Bloomer v. Colvin*, 3:13-CV-00862, 2014 WL

4105272, at *5 (M.D. Pa. Aug. 19, 2014) (Jones, J.); *House v. Colvin*, 3:12-CV-

02358, 2014 WL 3866072, at *8 (M.D. Pa. Aug. 6, 2014) (Kane, J.); *Muhaw v.

Colvin*, CIV.A. 3:12-2214, 2014 WL 3743345, at *15 (M.D. Pa. July 30, 2014)

(Mannion, J.). *Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11

(M.D. Pa. June 18, 2014) (Mariani, J.); *Arnold v. Colvin*, 3:12-CV-02417, 2014

WL 940205, at *4 (M.D. Pa. Mar. 11, 2014) (Brann, J.); *Kaumans v. Astrue*, 3:11-

CV-01404, 2012 WL 5864436, at *12 (M.D. Pa. Nov. 19, 2012) (Caputo, J.);

*Troshak v. Astrue*, 4:11-CV-00872, 2012 WL 4472024, at *7-8 (M.D. Pa. Sept. 26,

2012) (Munley, J.); *Shedden v. Astrue*, 4:10-CV-2515, 2012 WL 760632, at *11

(M.D. Pa. Mar. 7, 2012) (Rambo, J.).

With regard to Dr. Li's opinion, the ALJ wrote that:

> [It] is not well-support [sic] by medically acceptable laboratory
> diagnostic techniques and inconsistent with other evidence of record.
> The claimant initially saw Dr. Li for her lower back, but he is offering
> an opinion in regard to the claimant's right knee and ankle without
> citing to diagnostic support for his opinions. Additionally, the
> treatment records from the actual providers who performed the
> surgeries on these body parts indicate a good recovery from both
> procedures with no additional visits with complaints of pain. The

opinion regarding the severity of claimant's lower back condition is not supported by clinical findings, as the only noted finding on examination is focal tenderness in the lumbar region. Dr. Li's own records repeatedly cite a lack of current lumbar imaging. Therefore, Dr. Li's opinion is inconsistent with the medical evidence of record.

(Tr. 18-19). In sum, the ALJ rejects Dr. Li's opinion based on an independent interpretation of the medical records.[2]

However, the ALJ has no medical training. Dr. Li, who has medical training, concluded that his findings supported his opinion. As the Third Circuit has explained, "an ALJ may not make speculative inferences from medical reports. In addition, an ALJ is not free to employ her own expertise against that of a physician who presents competent medical evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (internal citations omitted). As another District Court has explained:

> The United States Court of Appeals for the Third Circuit disfavors administrative decisions which reject assessments presented by treating physicians in favor of those submitted by non-examining consultants. *Brownawell v. Commissioner of Social Security,* 554 F.3d 352, 357 (3d Cir.2008). Where the treating physician's opinion is "internally contradictory," it may be outweighed by an opinion expressed by a non-examining consultant. *Jones v. Sullivan,* 954 F.2d 125, 129 (3d Cir.1991). In this case, however, the record did not contain an assessment from a medical consultant. (R. at 37). Dr. Spellacy's opinion was uncontradicted. The limitations identified by Dr. Spellacy would preclude an individual from maintaining a full-time job. (R. at 63). Since no physician opined that Barnett could perform the "light" work reflected in the ALJ's residual functional

---

[2] The Court also notes that this is a mischaracterization of Dr. Li's treatment. At Dr. Li's initial evaluation, and every follow-up thereafter, Dr. Li evaluated and treated Plaintiff's right knee pain. (Tr. 364, 366, 573-80, 585, 587, 589, 593). For instance, Dr. Li provided Plaintiff with a right knee injection on June 23, 2011. (Tr. 365).

> capacity assessment, the Commissioner's decision denying Barnett's
> application for benefits is not supported by substantial evidence. *Doak*
> *v. Heckler,* 790 F.2d 26, 29 (3d Cir.1986).

*Barnett v. Colvin*, CIV.A. 12-224, 2013 WL 5724511 (W.D. Pa. Oct. 21, 2013).

Dr. Li's opinion is intrinsically related to the credibility assessment. When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting
> effects of the individual's symptoms to determine the extent to which
> the symptoms limit the individual's ability to do basic work activities.
> For this purpose, whenever the individual's statements about the
> intensity, persistence, or functionally limiting effects of pain or other
> symptoms are not substantiated by objective medical evidence, the
> adjudicator must make a finding on the credibility of the individual's
> statements based on a consideration of the entire case record.

SSR 96-7P; *See also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing  20 C.F.R. § 404.1529(c)). The Third Circuit has explained:

> An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence. *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985). "While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Green,* 749 F.2d at 1071. Where medical evidence does support a claimant's complaints of pain, the complaints should then be given "great weight" and may not be disregarded unless there exists contrary medical evidence. *Carter,* 834 F.2d at 65; *Ferguson,* 765 F.2d at 37.

*Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

Dr. Li's opinion constitutes uncontradicted medical evidence that supports Plaintiff's claims. Thus, Plaintiff's claims should have been given "great weight" and should only be disregarded if there is contrary medical evidence. *Id*. The Third Circuit in *Ferguson* noted the relationship between medical opinions and credibility:

> We also note that the ALJ acted improperly in discrediting the opinions of Dr. Scott by finding them contrary to the objective medical evidence contained in the file. By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence. Again, if the ALJ believed that Dr. Scott's reports were conclusory or unclear, *it was incumbent upon the ALJ to secure additional evidence from another physician.*
>
> As to Ferguson's complaints of subjective pain, the Secretary's acts are at odds with the Third Circuit standard, which requires (1) that subjective complaints of pain be seriously considered, even where not fully confirmed by objective medical evidence, (2) that subjective pain "may support a claim for disability benefits," and "may be disabling," (3) that when such complaints are supported by medical evidence, they should be given great weight, and finally (4) that where

> a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence..
>
> Based on this record, we believe that Ferguson's subjective complaints of pain and shortness of breath should have been credited since they are supported by Dr. Scott's statements and by evidence of medical impairments "which could reasonably be expected to produce the pain or other symptoms alleged." Under the Act, objective medical proof of each and every element of pain is not required.

*Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) (emphasis added) (internal citations omitted). Here, like *Ferguson,* the ALJ "independently review[ed] and interpret[ed]" the medical evidence, and "impermissibly set [her] own expertise against that of a physician who presents competent evidence." *Id.* Plaintiff's claims were "supported by [Dr. Li's] statements and by evidence of medical impairments 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id*. Because "it was incumbent upon the ALJ to secure additional evidence from another physician," and the ALJ failed to do so, the ALJ's credibility assessment and RFC assessment lacks substantial evidence.

Defendant asserts that the other reasons provided by the ALJ for rejecting Plaintiff's credibility provide substantial evidence.  The ALJ generally rejected Plaintiff's report and Dr. Li's opinion that she could not engage in prolonged sitting or standing because:

- "[T]he medical records subsequent to the total knee replacement demonstrate a positive outcome with a short period of postoperative treatment." (Tr. 17).

- "[T]he medical records [regarding Plaintiff's back] demonstrate the claimant had a history of intensive treatment, followed by a period of decreased symptomatology." (Tr. 17).
- "Dr. Li's records consistently indicate that the claimant has focus tenderness in the paraspinal area of the lower spine on the right side without any spasm or other clinical findings noted," Dr. Li "also repeatedly cited to a lack of current lumbar imaging," and "Dr. Li continues to treat the claimant's condition with medication and has not referred her to an orthopedic doctor for further evaluation." (Tr. 18).
- "In regard to the claimant's alleged impairments related to her right ankle, the medical records demonstrate a successful fusion surgery with some residual arthritis, and an additional successful procedure to remove one screw." (Tr. 18).
- "The treatment record [from July 1, 2011] indicates '[t]here is no clinical reason for the [ankle] discomfort that the patient is currently experiencing." (Tr. 18).
- "Despite allegations of debilitating, constant pain, the claimant reported that she is able to perform multiple activities through the day including bathing, laundry, cleaning, dusting, feeding her dogs, using a computer and occasionally watching her three-year old grandson....she goes outside daily and to church and the store….she was able to go to a festival in her town but could not walk through the whole thing…she was able to take a trip to Ireland, which involved an eight-hour flight." (Tr. 19).
- "Despite continuous complaints that her back pain is worsening, the claimant continues to treat her condition with pain medications and has not tried additional physical therapy or treatment with specialist." (Tr. 19).
- "[T]he claimant…file[d] for unemployment compensation and certif[ied] that she was able and available for work…she continued to look for the same type of work she was doing, sent out resumes and had interviews." (Tr. 19).

Thus, the ALJ relied on: (1) her interpretation of the treatment records, (2) Plaintiff's activities of daily living, (3) Plaintiff's course of treatment, and (4) Plaintiff's receipt of unemployment and attempt to return to work.

As discussed above, the ALJ's conclusion that Plaintiff's claims were not supported by the treatment records was flawed because the ALJ set her own

expertise against that of a competent physician. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). With regard to Plaintiff's activities, Plaintiff asserts that the ALJ erred in relying on "sporadic and transitory activities." (Pl. Brief at 14) (quoting *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3rd Cir. 2001) ("[S]poradic and transitory activities cannot be used to show an ability to engage in substantial gainful activity"). Defendant responds that the activities cited by the ALJ "do not fit [the] description" of "sporadic and transitory." (Def. Brief at 20) (citing *Burke v. Commissioner,* 317 F. App'x 240, 244 (3d Cir. 2009); *Giese v. Commissioner*, 251 F. App'x 799, 803 (3d Cir. 2007); *Tuohy v. Commissioner*, 127 F. App'x 62, 65 (3d Cir. 2005)).

None of the cases cited by Defendant are binding precedent. In contrast, *Fargnoli*, which is binding precedent, states:

> Fargnoli's trip to Europe in 1988 cannot be the basis for a finding that he is capable of doing a light exertional job because sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity.

*Fargnoli v. Massanari*, 247 F.3d 34, 44 (3d Cir. 2001) (internal citations omitted); *see also Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity....It is well established that sporadic or transitory activity does not disprove disability"); *Kangas v. Bowen*, 823 F.2d 775, 778 (3d Cir. 1987) ("The regulations defining residual functional capacity direct the

Secretary to determine a claimant's capacity for work on a '*regular* and *continuing* basis.' 20 C.F.R. Regulations No. 4, Subpt. P, § 404.1545(b) (1986) (emphasis added). Similarly, the Medical-Vocational Guidelines for sedentary work refer to an individual's 'maximum *sustained* work capability.' 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 2, § 201 (1986) (emphasis added)").

The Court in *Smith v. Califano* adopted the "sporadic and transitory" language from *Wilson v. Richardson*, 455 F.2d 304 (4th Cir. 1972), where the claimant had temporarily worked at eleven jobs over a three-year period and was working forty hours per week at the time of the hearing. *Id.* at 307. However, the Court found that this was not evidence that the claimant was not disabled, explaining that:

> Section 404.1534(a) includes the following illustration:
>
>> Where an individual is forced to discontinue his work activities after a short time because his impairment precludes continuing such activities, his earnings would not demonstrate ability to engage in substantial gainful activity.
>
> We point out, without deciding, that under this language or the principle the Regulation embodies, Wilson's sporadic and transitory activities may demonstrate not his ability, but his inability to engage in substantial gainful activity.

*Id.* The regulation continues, "[g]enerally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club

activities, or social programs to be substantial gainful activity."   20 C.F.R. §
404.1572.

Here, none of the activities cited by the ALJ indicate that Plaintiff can stand
or walk for six hours a day on a regular and continuing basis. *Fargnoli* squarely
addressed the relevant of an overseas trip, and concluded that such a trip
constituted sporadic and transitory activity. Plaintiff's ability to "take care of
[herself], [engage in] household tasks, hobbies…club activities, or social
programs" do not indicate that she can engage in substantial gainful activity. 20
C.F.R. § 404.1572.  The ALJ improperly relied on Plaintiff's activities of daily
living to conclude that her reported limitation in prolonged standing and walking
was not credible.

Plaintiff asserts that the ALJ was not entitled to rely on Plaintiff's
conservative treatment because she did not consider the possible explanations for
Plaintiff's conservative treatment. SSR 96-7p provides that:

> [T]he adjudicator must not draw any inferences about an individual's
> symptoms and their functional effects from a failure to seek or pursue
> regular medical treatment without first considering any explanations
> that the individual may provide, or other information in the case
> record, that may explain infrequent or irregular medical visits or
> failure to seek medical treatment. The adjudicator may need to
> recontact the individual or question the individual at the
> administrative proceeding in order to determine whether there are
> good reasons the individual does not seek medical treatment or does
> not pursue treatment in a consistent manner. The explanations
> provided by the individual may provide insight into the individual's
> credibility. For example: . . .

> The individual may have been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual.

SSR 96-7p. Plaintiff asserts that her neurologist never recommended "additional physical therapy or treatment with specialist." (Pl. Reply at 3). Plaintiff also asserts that her "reliance upon her treating neurologist's recommendations should not be held against hers in assessing her RFC or her credibility under SSR 96-7p." (Pl. Reply at 3). Here, there is no indication that the ALJ considered any explanation for Plaintiff's allegedly conservative treatment. Concluding that Plaintiff's allegedly conservative treatment was due to a lack of debilitating impairment is only one of several plausible inferences, and the ALJ was not entitled to rely on this inference without considering Plaintiff's explanation for her treatment. *See Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) ("[A]n ALJ may not make 'speculative inferences from medical reports'") (quoting *Plummer*, 186 F.3d at 429).

This leaves only Plaintiff's receipt of unemployment and attempts to look for work as a rationale to reject her claims and her treating physician's opinion. The Third Circuit has yet to address whether the receipt of unemployment benefits can adversely affect a social security claimant's credibility. Other circuits have found that continued receipt of unemployment benefits can cast doubt on a claim of disability, as it shows that an applicant holds himself or herself out as capable of

working. *E.g.*, *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014), *accord Schmidt v. Barnhart,* 395 F.3d 737, 745–46 (7th Cir. 2005) (recognizing receipt of unemployment benefits could impact a claimant's disability claim); *Grable v. Colvin*, 770 F.3d 1196, 1202 (8th Cir. 2014) (citing to *Barrett v. Shalala,* 38 F.3d 1019, 1023 (8th Cir. 1994)) (finding that claimant's collection of unemployment benefits during the period of her claimed disability reinforced the ALJ's adverse credibility finding).

However, receipt of unemployment benefits does not necessarily contradict a claimant's assertion of inability to work. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161-62 (9th Cir. 2008) (finding where the record did not establish whether claimant held himself out as available for full-time or part-time work, being available for part-time work was not inconsistent with disability allegations); *Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) (noting that applying for unemployment benefits adversely affects credibility is not conclusive). In *Cox v. Apfel*, the Eight Circuit summarized:

> We have held that the acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability.  However, the negative impact cannot be uniformly or automatically applied in every case. Where, as here, there is no other evidence to detract from the claimant's credibility, the negative inference is not sufficient, of itself, to negate the claimant's credibility.

160 F.3d 1203, 1208 (8th Cir. 1998) (internal citations omitted). The Court finds the above authority from the Seventh, Eighth and Ninth Circuits persuasive in concluding that receipt of unemployment benefits can adversely impact a social security benefit claimant's credibility, however, the negative impact cannot be uniformly or automatically applied in every case. *E.g.*, *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161-62; *Cox v. Apfel*, 160 F.3d 1203, 1208.

As discussed above, Plaintiff's claims were supported by an uncontradicted medical opinion from her treating physician. The ALJ was not entitled to "discount [Plaintiff's] pain without contrary medical evidence." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). Plaintiff's receipt of unemployment is not contrary medical evidence. Moreover, as the Third Circuit has explained:

> [O]ur decisions make clear that determination of the existence *vel non* of substantial evidence is not merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by counterveiling evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (internal citations omitted). Here, Plaintiff's receipt of unemployment is a "single piece of evidence" that does "not satisfy the substantiality test" because it is "overwhelmed by other evidence…offered by [a] treating physician." *Id*. Consequently, the Court

concludes that the ALJ's credibility determination lacks substantial evidence, and recommends remand for the ALJ to properly evaluate Plaintiff's credibility.

## B.    The ALJ's assessment of past relevant work

Plaintiff also asserts that the ALJ made internally contradictory findings regarding her ability to perform her past relevant work as a microbiology technologist. (Pl. Reply at 2). The ALJ found that this work, as actually performed, required occasional kneeling. (Tr. 20). In the RFC finding, the ALJ concluded that Plaintiff "cannot…kneel." (Tr. 16). Thus, these are internally inconsistent.

However, this error was harmless, because if Plaintiff can return to her past relevant work as generally performed in the national economy, she is not disabled. SSR 82-61 provides that there are three tests to determine whether a claimant can perform past relevant work. Under the third test, the claimant does not need to be able to perform the past relevant work as actually performed. Instead, the claimant only needs to be able to perform the past relevant work as it exists in the national economy:

> Whether the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy. (The *Dictionary of Occupational Titles* (DOT) descriptions can be relied upon--for jobs that are listed in the DOT -- to define the job as it is *usually* performed in the national economy.) It is understood that some individual jobs may require somewhat more or less exertion than the DOT description.
>
> A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those

> generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

*Id*. (emphasis in the original); *see also Garibay v. Comm'r Of Soc. Sec.*, 336 F. App'x 152, 158 (3d Cir. 2009). The regulations explicitly provide that:

> [A] vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2). The Third Circuit has held that such vocational expert testimony constitutes substantial evidence:

> After the ALJ properly concluded that [claimant] had the RFC to perform light work, it considered the vocational expert's testimony, based on the hypothetical question representing all of [claimant's] credible impairments. The vocational expert testified that [claimant] could perform her past relevant work, as it is generally performed in the national economy. Therefore, the ALJ's determination that [claimant] was ineligible for DIB is supported by substantial evidence.

*Diaz v. Comm'r of Soc. Sec.*, 440 F. App'x 70, 73 (3d Cir. 2011) (citing 20 C.F.R. § 404.1560(b)(2)).

Here, the ALJ asked the vocational expert if Plaintiff had "no crawling or kneeling, would that have an effect" on performing work as a microbiology technologist. (Tr. 72). The VE testified "I don't think crawling or kneeling was

affiliated with that from my research." (Tr. 72). Similarly, the Dictionary of

Occupational Titles ("DOT") states that, for a microbiology technologist:

> Climbing: Not Present - Activity or condition does not exist
> Balancing: Not Present - Activity or condition does not exist
> Stooping: Not Present - Activity or condition does not exist
> Kneeling: Not Present - Activity or condition does not exist
> Crouching: Not Present - Activity or condition does not exist
> Crawling: Not Present - Activity or condition does not exist

078.261-014   MICROBIOLOGY   TECHNOLOGIST,   DICOT   078.261-014.

Consequently, the position as generally performed does not require kneeling. This

error would not affect the outcome of the case, so the Court does not recommend

remand on this ground. *See Rochek v. Colvin*, 2:12–CV–01307, 2013 WL 4648340

at *12 (W.D.Pa. Aug.23, 2013) ("A number of other courts have found harmless

error where an alleged limitation that was not included in the ALJ's hypothetical

(or in the RFC) was not necessary to perform one or more of the jobs identified by

the VE, according to the DOT"); *Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d

Cir. 2005) (remand is not required when it would not affect the outcome of the

case).

## VII.    Conclusion

The undersigned recommends that the Court vacate the decision of the

Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further

proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.      The decision of the Commissioner of Social Security denying Plaintiff's social security disability insurance and supplemental security income benefits be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.      The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: February 13, 2015                        _____s/Gerald B. Cohn_____
                                                              GERALD B. COHN
                                                              UNITED STATES MAGISTRATE JUDGE